BLAKELY LAW GROUP
BRENT H. BLAKELY (CA Bar No. 157292)
1334 Parkview Avenue, Suite 280
Manhattan Beach, California 90266
Telephone:   (310) 546-7400
Facsimile:   (310) 546-7401
Email:       BBlakely@BlakelyLawGroup.com

Attorneys for Defendants
ESSENTIAL CONSULTANTS, LLC and MICHAEL COHEN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE CLIFFORD a.k.a. STORMY DANIELS a.k.a. PEGGY PETERSON, an individual,<br><br>                    Plaintiff,<br><br>          v.<br><br>KEITH M. DAVIDSON, an Individual, MICHAEL COHEN, an individual, and DOES 1 through 10, inclusive,<br><br>                    Defendants. | Case No. 2:18-cv-05052-SJO (FFMx)<br><br>**DECLARATION OF BRENT H. BLAKELY IN SUPPORT OF DEFENDANT MICHAEL COHEN'S MOTION FOR STAY OF THIS ACTION**<br><br>**Date:        August 27, 2018**<br>**Time:        10:00 a.m.**<br>**Location:   Courtroom 10C**<br><br>**Hon. S. James Otero**<br><br>Action Filed:  June 6, 2018 |

## DECLARATION OF BRENT H. BLAKELY

I, Brent H. Blakely, declare:

1.     I am an attorney duly licensed to practice before all courts of the State of California and in the U.S. District Court for the Central District of California, among other courts.  I am the principal of the law firm of Blakely Law Group, counsel of record for Defendant Michael Cohen ("Mr. Cohen").  I make this declaration based on my own personal knowledge and, if called and sworn as a witness, I could and would competently testify hereto.

2.     Attached hereto and incorporated herein as **Exhibit A** is a true and correct copy of an excerpt of a transcript of Michael Avenatti's June 13, 2018 appearance on *"The Lead"* on *CNN*, which was published by *CNN* on or about June 13, 2018, at the following URL:

http://transcripts.cnn.com/TRANSCRIPTS/1806/13/cg.01.html

3.     Attached hereto and incorporated herein as **Exhibit B** is a true and correct copy of Plaintiff's Complaint for Defamation against Donald J. Trump (Case No. 1:18-cv-03842), filed in the United States District Court, Southern District of New York, on April 30, 2018, which is available on the Pacer website for the Southern District of New York (https://ecf.nysd.uscourts.gov).

4.     Attached hereto and incorporated herein as **Exhibit C** is a true and correct copy of a transcript of the May 30, 2018 hearing in the matter of *Michael D. Cohen v. United States of America*, United States District Court, Southern District of New York, Case No.1:18-mj-03161-KMW (the "Cohen SDNY Action") (*see* relevant excerpts at: pp. 27:12-28:13).

5.     Attached hereto as **Exhibit D** is a true and correct copy of a June 14, 2018 preservation of the first page of Mr. Avenatti's Twitter page, which is accessible at https://twitter.com/MichaelAvenatti.  At the time this preservation was made, Mr. Avenatti's Twitter account reflected that he had 538,000 Twitter followers.

6.      On June 20, 2018, I e-mailed a letter to counsel for Plaintiff requesting an in-person meet and confer to discuss (among other issues) a motion to stay the present action. Attached hereto and incorporated herein as **Exhibit E** is a true and correct copy of my June 20, 2018 letter to Plaintiff's counsel.

7.      On June 26, 2018, counsel for Plaintiff, Ahmed Ibrahim, came to my office to discuss the matters presented in my June 20 correspondence. The parties discussed Cohen's position that the present action should be stayed for the same reasons presented in *Clifford v. Trump*. Mr. Ibrahim disagreed and would not stipulate to staying this case.

8.      On June 26, 2018, I also met and conferred with Defendant Keith M. Davidson regarding the present application. The parties conducted this meeting over the phone, as Mr. Davidson was travelling out of state with his family. Mr. Davidson indicated that he would not oppose this application.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 27, 2018, in Los Angeles, California.

/s/ *Brent H. Blakely*
BRENT H. BLAKELY

# EXHIBIT A

Home

# TRANSCRIPTS    Transcript Providers

Shows By Category:

Return to Transcripts main page

## THE LEAD WITH JAKE TAPPER

The Trump Effect; President Trump Says Mission Accomplished in North Korea; Michael Cohen Changing Legal Team; Trump: North Korea "No Longer a Nuclear Threat". Aired 4-4:30p ET

Aired June 13, 2018 - 16:00   ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

[16:00:10]

JAKE TAPPER, CNN HOST: Did Michael Cohen just send an SOS to President Trump?

THE LEAD starts right now.

Breaking news: President Trump's personal lawyer and fixer changing his legal team. Does this signal that he's going to cooperate? Does it signal that he's any more likely to flip?

Stormy Daniels' attorney will be her live to react in just moments.

After one meeting, one handshake, one signature, President Trump says the North Korea nuclear threat is over. Really? Is this his mission accomplished moment?

The Trump effect in full effect in key primary races across the country. Is loyalty to President Trump now trumping conservative principles in the Republican Party?

Good afternoon, everyone. Welcome to THE LEAD. I'm Jake Tapper.

We're going to start with breaking news.

Is the president's fixer about to flip? Now, we don't know the answer. We don't know that to be the case. But there are clearly signs of distress from Michael Cohen, the president's lawyer who was behind that hush money payment to Stormy Daniels and who knows what else.

CNN has learned that Cohen has split from his legal team, according to a source familiar with his actions. Now, whether that is him leaving the legal team or them leaving him, that is unclear. A source tells CNN that Cohen has yet to meet with prosecutors to talk about a potential deal.

And we know Cohen wants a new legal team, one with experience with the U.S. attorney's office for the Southern District of New York, we're told, the office leading the criminal investigation of Cohen, including when the FBI raided Cohen's home, hotel room and office back in April. Now, as Cohen

tries to limit what seized -- prosecutors can see from

that cache of information, there are reports that suggest Cohen might be more inclined to cooperate with the U.S. attorney's office, but as of now there is no indication the U.S. attorney wants or needs his cooperation.

Prosecutors have made it clear in court and from documents submitted to the judge that they feel charges are likely and in all probability coming soon.

Let's bring in Michael Avenatti. He's the attorney representing Stormy Daniels.

Michael, good to see you.

Do you know if Michael Cohen is any more inclined to cooperate with the U.S. attorney?

MICHAEL AVENATTI, ATTORNEY FOR STORMY DANIELS: I don't know for certain, Jake. But, based on my experience, I will tell you this.

There is a common progression here when you have individuals that are in the situation that Michael Cohen is in. And they start off very defiant and then they realize how much a case like this costs to defend.

And, by the way, I estimate that his attorneys were probably soaking him for about a half-a-million dollars a week in connection with this case over the last two months. So that adds up very, very quickly. You could be looking upwards of $3 million or $4 million.

I'm sure Michael Cohen is not happy about paying that money, especially because I think they should have allowed the taint team to conduct the review of the documents and saved him quite a bit -- a lot of money.

But, look, I predicted this a couple of months ago. I said that he would be indicted within the next 90 days. I think we're at day 58 right now. And I also predicted that ultimately he would flip on the president because he would not be left with a choice.

And I'm going to hold to those predictions, and I think ultimately that is exactly what is going to happen.

TAPPER: What is your understanding of why he and his legal team split?

AVENATTI: Well, my understanding is, is that it has a significant -- there was a significant dispute about the fees that I just referenced, and there was also a dispute relating to the strategy associated with the case.

Here is the issue for Michael Cohen. With each passing day, Jake, his options become potentially more and more limited, because, if Bob Mueller ultimately concludes that a sitting president cannot be indicted -- and I think that he will ultimately conclude that, based on his pedigree and based on his -- how conservative he is just by nature -- Michael Cohen could be left without a chair when the music stops.

What do I mean by that? What I mean by that is, Michael Cohen could be left to face significant jail time with no one to flip on.

TAPPER: "Vanity Fair"'s Gabe Sherman tweeted -- quote -- "Person close to Cohen said he hasn't flipped yet. He is sending up a smoke signal to Trump I need help" -- unquote.

What do you think of that?

AVENATTI: I think that is possible. I think it is a little late to send up the smoke signal. And I don't think all of the smoke in the world is going to be able to save him.

And I think that ultimately Mr. Trump is going to leave him -- hang him out to dry because he's not known as a guy that is loyal to others, as you well know and has been well-documented.

And, again, I think, ultimately, Michael Cohen is going to be put on an island with very, very few choices.

TAPPER: On Friday, what you called the taint team -- that's the team appointed by the judge that is reviewing this evidence seized from Cohen's office, hotel room and home, looking forward to -- looking through it to see what can be turned over to prosecutors and what doesn't need it be -- does -- and that is going to be on Friday that the taint team makes its decisions.

[16:05:05]

Does that deadline, you think, have anything to do with this?

AVENATTI: I think it may have something to do with this as it relates to how much money has been spent in such a short period of time.

And I'm sure that Michael Cohen is probably running out of cash and availability. When you are burning a half-a-million dollars in a week potentially in a case like this, again, that adds up very, very quickly.

So, again, I think that the noose is tightening. I think reality is beginning to set in and it is going to continue to set in, in the coming days and weeks.

TAPPER: Well, where do you get the figure from? You say $350,000 to $500,000 a week, you're estimating, is what Michael Cohen is being billed by hi now former law firm. Where does that come from?

AVENATTI: Well, based on my experience and knowledge of rates in New York and Los Angeles. And I also understand based on filings and other statements that were made by Mr. Ryan and others on Michael Cohen's legal team relating to how many attorneys they have working on this and how often they were working around the clock, basically full- time. I did the math sitting in the courtroom the last time I was before

Judge Wood. I did the math on a piece of paper and came to the conclusion that that is probably a pretty good estimate of what that burn rate is.

TAPPER: Would you be told if Cohen were in talks, making a deal with prosecutors? Would that be something that you would be informed about?

AVENATTI: Well, I may very well be informed. We have been cooperating with federal prosecutors for a while now.

We have an excellent relationship with them. We communicate with them on a regular basis in connection with their investigation.

TAPPER: All right, Michael Avenatti, good to see you. Thanks so much for joining us.

AVENATTI: Thank you, sir.

TAPPER: We have legal experts, Kim Wehle and Jeffrey Toobern -- Toobin joining me now.

I think I botched both your names.

Let me start.

Jeffrey, what is the significance of him changing -- of Michael Cohen changing his legal team, if any?

JEFFREY TOOBIN, CNN SENIOR LEGAL ANALYST: It is not clear, because his current legal team could bring him in and have him plead guilty and cooperate.

So it is not like you have to get new lawyers in order to cooperate. It is often the case that when someone switches sides and does decide to cooperate, they switch lawyers. So it is possible that this is a sign of -- but I would like to associate myself with about 50 percent lower of certainty than Michael just expressed.

I don't know what the significance of this is. It is possible it's a sign of cooperation, but it is by no means certain.

TAPPER: Well, he's an advocate. You're an analyst.

TOOBIN: Correct. Correct.

TAPPER: So, of course, a little different.

Kim, do you draw any conclusions about how Michael Cohen might now be seeing the case against him? Do you think this is a matter, as Jeffrey suggested, of getting a team that will enable him to work more closely with the U.S. attorney's office for the Southern District of New York?

KIM WEHLE, FORMER ASSOCIATE INDEPENDENT COUNSEL: Well, I think that the firm he has is a very well-established firm with experienced people there.

We did see, as was mentioned, a team of people in the firm going through 3.7 million documents to find -- I think the woman who is in charge of actually reviewing the materials that were retrieved in the execution of the warrant found a couple of hundred that were attorney/client privilege.

So there is a question as to whether all of that was worth it. And, secondly, it doesn't sound like the judge, this judge has had the strongest endorsement of this legal team. She's mentioned at one point in a hearing that they have had misstatements of the law and she has praised the Southern District of New York.

So there are lots of times where, in big cases, whether criminal or civil, at some point there is a strategic decision, listen, we need fresh people. So it could come from either the lawyers, as was mentioned, not getting paid or just deciding this isn't a fit or from Mr. Cohen deciding, little, I need a different approach going forward.

TAPPER: So, Gabe Sherman from "Vanity Fair" says that sources close to Cohen this is about sending a smoke signal to President Trump, SOS, help me out here.

Why not just call President Trump? Obviously, we're in a world now where those kinds of quaint rules, regulations and traditions don't apply where somebody wouldn't make such a call.

TOOBIN: Well, I think even in Trump world, asking -- calling up and asking for a pardon could be a little excessive even in this world.

But Donald Trump knows that Michael Cohen wants a pardon. He knows how much trouble he's in. Let's keep in mind this is a lawyer who had his office searched. You would not get a search warrant for a lawyer's office unless there was something way more than probable cause that he -- that he was guilty of some crime.

But he hasn't been charged with anything yet. And Donald Trump has not suggested -- has not given a pardon yet. I think giving a pardon to Michael Cohen would be politically much more difficult than any of the other pardons he's given so far, just because there is no suggestion that Michael Cohen

has any national security, government responsibility.

He's just a private lawyer. It would be seen as very much a self- interested act. But Donald Trump has broken many of the rules we have ascribed to him before and he may break these too.

TAPPER: And, Kim, if you were on the president's legal team right now, what might you be thinking about all of this going on in the Southern District o New York?

[16:10:03]

Obviously, the preoccupation is Mueller, but this is -- this seems significant as well. WEHLE: Well, I think the -- we should have our eye on what happens

with the president at this point, because even if you were to have the audacity to make a pardon, it wouldn't affect any state crimes that Mr. Cohen might be liable for.

And, remember, he had -- one of his partner in the taxicab business has already been in some legal jeopardy. And so there are implications there. Mr. Trump couldn't help him with that.

So what I'm interested in seeing is, if there is going to be a Cohen plea or some kind of approach with the government, ether the Southern District of Nev York or the Mueller team, how does Mr. Trump react? Does he continue his all-out assault on the integrity of the Justice Department?

That is the bigger sort of constitutional problem that I think we're facing as a nation, that we don't have someone at the head of the executive branch who is respecting the integrity of the process. And that could trigger, could actually create much more trouble than we're currently in.

TOOBIN: Kim is definitely right that a pardon would not affect a state case.

But I think there is a bit of mythology about the chances of a state prosecution in any of these cases. State attorneys general, especially in New York, do not do many criminal cases. They don't have the resources. They don't have the experience. They don't have the underlying laws.

So I think we need to recognize this case is going to be resolved in federal court one way or another. And a pardon would get Michael Cohen off the hook, period.

TAPPER: All right, Kim and Jeffrey, thank you so much. Really appreciate it.

Guys, don't worry, President Trump says we can all sleep well tonight, North Korea is no longer a nuclear threat. Hmm?

Should we remind President Trump about that George W. Bush mission accomplished moment?

Stay with us.

(COMMERCIAL BREAK)

[16:15:50] TAPPER: President Trump says you all can sleep well tonight because he's solved all of the problems with North Korea, tweeting, quote: There is no longer a nuclear threat from North Korea.

That's just not true. Experts say North Korea may have as much as 60 nuclear weapons in the arsenal. North Korea routinely bragged about testing an

intercontinental ballistic missile that could hit the U.S. mainland.

And as CNN's Michelle Kosinski explains, despite the historic summit, President Trump did not yet get any guarantees from Kim Jong-un.

(BEGIN VIDEOTAPE)

MICHELLE KOSINSKI, CNN SENIOR DIPLOMATIC CORRESPONDENT (voice-over): President Trump capping a historic summit with a victory tweet: Just landed, a long trip but everybody can now feel much safer than the day I took office. There is no longer a nuclear threat from North Korea.

A tweet that may have gone too far.

SEN. BOB CORKER (R), TENNESSEE: Well, that would be hyperbole.

REP. NANCY PELOSI (D), CALIFORNIA, MINORITY LEADER: The denuclearization has not happened or any prospect that it will.

SEN. JOHN CORNYN (R), TEXAS, INTELLIGENCE COMMITTEE: No. I think they made some representations about their intention, but this is the beginning I think of a long, long process. We're not at the end of the road, we're at the beginning.

KOSINSKI: And after meeting with the oppressive murderous dictator of North Korea, whom he thanked for his time, it seems President Trump believe their relationship changes the equation and North Korea's long history of nuclear ambition.

Meantime, North Korea state-run media is celebrating Trump suspending joint military exercises with South Korea without even notifying U.S. allies. Trump again tweeting: We save a fortune by not doing war games as long as we're negotiating in good faith which both sides are.

Some analysts call that a giant gift to China and Russia which want to see less U.S. influence in the region. Both have called for a freeze for freeze plan for the U.S. to freeze military exercises and return for North Korea freezing its nuclear program. Something Trump himself said he would definitely not do back in November.

DONALD TRUMP, PRESIDENT OF THE UNITED STATES: President Xi recognizes that a nuclear North Korea is a grave threat to China and we agree that we would not accept a so-called freeze for freeze agreement, like those that have consistently failed in the past.

KOSINSKI: But a "Wall Street Journal" article in January cite sources that suggest it was Russia's Vladimir Putin who gave Trump the idea to go this route, during a conversation they had. And that Trump's Defense Secretary James Mattis and steered the president away from it, at least until now.

Leaving Republicans doing their best to defend that Trump has given these things to Kim Jong-un without getting any clear plan for denuclearization in return.

SEN. CORY GARDNER (R-CO), FOREIGN RELATIONS COMMITTEE: I think the exercise -- the exercises are important. I would like to see them continue. But perhaps the president believes this is a way to move forward with President Kim.

REPORTER: Do you view Kim Jong-un as a great guy who just wants to do right by his people and no longer poses a threat to the United States?

REP. PAUL RYAN (R), WISCONSIN, SPEAKER OF THE HOUSE: Look, the status quo was not working with North Korea.

(END VIDEOTAPE)

KOSINSKI: Now, it is the task of Secretary of State Mike Pompeo to explain all of this to U.S. allies, to talk to South Korea. He's also talking to China.

He says talks with North Korea are expected to resume within the next week or so, Jake.

TAPPER: All right. Michelle Kosinski, thanks so much.

So let's talk about it with the panel.

Josh Holmes, obviously, we hope this all leads to a denuclearized North Korea and a denuclearized Korean peninsula. But to say that there's no longer a nuclear threat from North Korea, it's just not true.

JOSH HOLMES, REPUBLICAN STRATEGIST: Yes, I mean, we're clearly not there yet. And don't know if the president was trying to say -- I mean, obviously if you take his words literally, that is what he's suggesting, but I think he's trying to do is reassure the American people that we are not in the same position that we were in last summer where you had North Korea basically firing off intercontinental ballistic missiles like bottle rockets into the ocean over Japan.

We're not in that situation any longer and I think he's trying to signify to the American people, look, we're making progress here.

TAPPER: So, Kirsten, President Trump said Kim trusts me and I trust him. Is the president hanging his confidence in how this will all end on this personal relationship as opposed to, I don't know, 30 years of history?

[16:20:03] KIRSTEN POWERS, CNN POLITICAL ANALYST: Yes, I mean, it's hard to know exactly what he's trying to do here, because if you look at it, it seems like he gave away a lot and didn't really get anything in return. He's saying that he got something, but there is nothing that's remotely verifiable. There is nothing, there's really nothing. And if you compare it to the -- to the criticisms made about the Iran deal, which actually did have inspections and is actually is a deal that's written down and we don't have that.

We also have legitimized one of the most evil men in the world. And you even have the president saying in interviews when he's confronted about the fact that he runs concentration camps and oppresses his people and is just a truly evil man, where he has to be -- he didn't say tough guy or something like that, why are his people in an uprising?

TAPPER: Yes.

POWERS: No, they are not. So, he's making excuses for literally one of the worst dictators in the world right now and giving him the thumbs up.

TAPPER: One of the things I wonder about, Josh, is what this means in terms of negotiation. And, you know, we like to play a game on this show called is there a tweet for it? And yes, there is a tweet for it. 2013, President Trump tweeted, then private citizen Trump: The reason great deal makers do not openly celebrate a deal, especially one that is not complete, is that it shows weakness to the other side, unquote.

Good advice, makes sense, doesn't that point hold here? Isn't his eagerness to herald this deal, doesn't that possibly show some weakness to the North Koreans? We already have the Russian and Chinese now talking about lifting sanctions.

HOLMES: Well, he's got a dual role, right? It's not just the deal. He also has a role with the American people to play about explaining exactly what's going on here and what he's trying to accomplish.

Now, I find it pretty interesting, all of the criticism that he's received from the right and from the left, all from folks who've basically spent the last 25 years that got us to a place where we are on the brink of nuclear war last year.

Now, look, I don't know if this is ultimately going to be successful or not, but it certainly can't be any less successful than we've been up to this point. So I'm going to give some room.

POWERS: I don't know. Were we really on the brink of nuclear war? I mean, people keep saying this. I think --

HOLMES: I don't know what it looks like if it doesn't look like that.

POWERS: I think that he was -- Kim was doing what he always does, which is he was making provocative statements that were typically ignored
because everybody knows he makes provocative statements. The president decided to engage and make provocative statements.

TAPPER: Last year, yes.

POWERS: So whose fault is it if we were, in fact, on the verge -- we probably weren't but if we were whose fault is it?

HOLMES: Don't you think it is fundamentally different when he for the first time was able to launch intercontinental ballistic missiles that have the
capability of hitting mainland the United States --

POWERS: Yes, I don't think --

HOLMES: -- for the first time? If you don't react to that, what are you doing?

POWERS: No, you should react to it. I think what we're talking about is how do you react to it and how do you go from that to the verge of nuclear war
and it's how the president reacted to it. And I think that -- the fact of the matter is, like Jake said at the beginning, everybody would like to see this
problem solved. The problem has not come close to being solved and he gave them

everything they wanted and we didn't get anything in return. I mean, why are we going to stop joint exercises? That's like a football team stopping --

TAPPER: How do you feel about that Josh? The idea that the U.S. is now going to withhold doing this joint U.S.-South Korean military exercises.

HOLMES: Well, I think we all have these conceptions of things that may or may not be significant at all. The idea that because we're not doing military
exercises means we're not military-ready? That's crazy.

POWERS: That's exactly what it means.

HOLMES: No, well, it's just fundamentally not true.

POWERS: That's not what military says. It's literally like if you just stopped having, you know, any kind of preparation -- if you are a football team.
We're just not going to practice anymore, we'll just show up at the Super Bowl and do our thing. They are practicing for a reason and the military said
they are very important so that they --

HOLMES: Well, it's a funny -- it's pretty interesting question --

POWERS: No, it's a joint --

(CROSSTALK)

HOLMES: -- Democrats position everywhere else in the world, right?

POWERS: What's that?

HOLMES: It's interesting, the argument to have -- if that's Democrats' position everywhere else in the world, that you draw down troops from everywhere except Korea.

POWERS: That's not even remotely the same thing. What do you think? Drawing down troops in Afghanistan is the same thing as Korea?

He's not drawing down troops. Let's not muddy the waters.

TAPPER: Yes.

POWERS: He's basically saying there aren't going to be joint exercises between two militaries that need to be prepared if there's a nuclear war.

HOLMES: I think we're creating a whole bunch of things to make it seem like we're not making progress here. My only point is we are at a situation where anybody can deny was pretty significant last year. There was tensions at an all time high.

We had people in Hawaii going to bomb shelters because of an accidental emergency alarm. Like that was a pretty tense period. No question that where we are right now is a significant amount of progress.

TAPPER: So, everyone stick around. We have more to talk about.

President Trump is embracing a candidate who is figuratively wrapped his campaign in the confederate flag as last night's primary results shows the Trump effect is in full effect.

Stay with us.

(COMMERCIAL BREAK)

[16:29:00] TAPPER: We're back with our politics lead. President Trump throwing his weight behind a Republican candidate for Senate, a candidate that many other Republicans call too extreme.

This morning, Mr. Trump fully embraced Corey Stewart, celebrating Stewart's primary win last night, writing, quote: Congratulations to Corey Stewart for his great victory for senator from Virginia. Don't underestimate Corey, a major chance of winning.

Stewart's nomination has alarmed many Republicans in Virginia and elsewhere. After all, one of his primary opponents, Green Beret combat veteran Nick Freitas had urged Virginians to, quote, reject Corey Stewart's dogwhistling of white supremacists and anti-Semites and racist.

Stewart is known for his championing of confederate symbols and his ties to several unrepentant bigots, including organizers and participants in the Charlottesville rally last year.

Here is Stewart in the 2017 at the so-called Old South Ball.

(BEGIN VIDEO CLIP)

COREY STEWART (R), VIRGINIA SENATE CANDIDATE: I'm proud to be next to the Confederate flag. Over my dead body when I'm governor of Virginia are we ever going to take down the statue of Robert E. Lee or Stonewall Jackson.

(END VIDEO CLIP)

Search CNN...                                    $\rho$

## U.S.

Crime + Justice

Energy + Environment

Extreme Weather

Space + Science

## World

Africa

Americas

Asia

Australia

Europe

Middle East

UK

45

Congress

Supreme Court

2018

Key Races

Primary Results

Markets

Tech

Media

Personal Finance

Luxury

## Opinion

Political Op-Eds

Social Commentary

Food

Fitness

Wellness

Parenting

Vital Signs

Stars

Screen

Binge

Culture

Media

Business

Culture

Gadgets

Future

Startups

Arts

Design

Fashion

Architecture

Luxury

Autos

Video

Destinations

Food & Drink

Play

Stay

Videos

Pro Football

College Football

Basketball

Baseball

Soccer

Olympics

## Video

Live TV

Digital Studios

CNN Films

HLN

TV Schedule

TV Shows A-Z

CNNVR

## Shop

CNN Underscored

-Explore

-Wellness

-Gadgets

-Lifestyle

CNN Store

## More...

Photos

Longform

Investigations

CNN profiles

CNN Leadership

CNN Newsletters

Work for CNN

CNN   U.S. Edition +

© 2018 Cable News Network. Turner Broadcasting System, Inc. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

Terms of Use | Privacy Policy | Accessibility & CC | AdChoices   | About us | CNN Studio Tours | CNN Store | Newsletters | Transcripts | License Footage | CNN Newsource

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Stephanie Clifford a.k.a. Stormy Daniels, | Civil Action No. |
| Plaintiff, | |
| - against – | |
| Donald J. Trump, | |
| Defendant. | APRIL 30, 2018 |

## COMPLAINT FOR DEFAMATION AND JURY DEMAND

Plaintiff Stephanie Clifford a.k.a. Stormy Daniels ("Ms. Clifford" or "Plaintiff"), by and through her attorneys, for her complaint alleges as follows:

### THE PARTIES

1.     Plaintiff Ms. Clifford, an individual, is a resident of the State of Texas.

2.     Defendant Donald J. Trump ("Mr. Trump" or "Defendant"), an individual, is a resident of the State of New York.

### JURISDICTION AND VENUE

3.     Pursuant to 28 U.S.C. § 1332, this Court has original jurisdiction over Plaintiff's claims based on the parties' diversity of citizenship and because the amount in controversy exceeds $75,000.

4.     Venue is appropriate in this judicial district, pursuant to 28 U.S.C. § 1391, because this Court has personal jurisdiction over Defendant and by reason of the fact that, among other things, this is a judicial district in which the Defendant resides.

## FACTUAL BACKGROUND

5.   Ms. Clifford began an intimate relationship with Mr. Trump in the summer of 2006 in Lake Tahoe.

6.   In May 2011, Ms. Clifford agreed to cooperate with *In Touch Magazine* in connection with an article about her relationship with Mr. Trump that the magazine was preparing at the urging of Ms. Clifford's ex-husband, who approached the magazine without approval from Ms. Clifford.  She did so only after being told that the magazine was going to be running the story with or without her cooperation.

7.   A few weeks later, in Las Vegas, Nevada, Ms. Clifford was approached and threatened by a man regarding her intention to tell the story of her relationship with Mr. Trump. The threat occurred in the presence of Ms. Clifford's infant daughter, in a parking lot.

8.   The man approached Ms. Clifford in the parking lot and said to her, "Leave Trump alone. Forget the story."

9.   The man then leaned around and looked at Ms. Clifford's infant daughter and said, "That's a beautiful little girl. It'd be a shame if something happened to her mom." The man then left.

10.   Ms. Clifford was shaken by the experience and understood the man's statement to be a direct threat.

11.   Because Ms. Clifford was frightened, however, she did not go to the police and did not seek to go public with her story at that time.  She likewise did not go to the police at that time because she was concerned about her relationship at the time and the impact that disclosure of the threat might have on her relationship.

2

12.     The story was never run by *In Touch* because, on information and belief, after the magazine called Mr. Trump seeking comment, his attorney Michael Cohen threatened and intimated the magazine into not proceeding with the story.

13.     Mr. Trump was elected President of the United States on November 8, 2016.

14.     Thereafter, on or about April 17, 2018 and on behalf of Ms. Clifford, a sketch of the man who threatened her in 2011 was released publicly. The sketch was created in consultation with Ms. Lois Gibson, one of the foremost forensic artists in the world. Ms. Gibson met with Ms. Clifford for an extended period of time while compiling the sketch and asked her numerous questions about the encounter and the assailant.

15.     The next day, on April 18, 2018, Mr. Trump, from his verified personal Twitter account (@realDonaldTrump) posted the following false statement regarding Ms. Clifford, the sketch, and her account of the threatening incident that took place in 2011:

> A sketch years later about a nonexistent man. A total con job, playing the Fake News Media for Fools (but they know it)!

16.     The statement posted by Mr. Trump was in response to another tweet posted by the account DeplorablyScottish (@ShennaFoxMusic) which showed side-by-side images of the sketch of Ms. Clifford's harasser and a picture of Ms. Clifford and her husband.

17.     Mr. Trump's statement falsely attacks the veracity of Ms. Clifford's account of the threatening incident that took place in 2011. It also operates to accuse Ms. Clifford of committing a crime under New York law, as well as the law of numerous other states, in that it effectively states that Ms. Clifford falsely accused an individual of committing a crime against her when no such crime occurred. Mr. Trump's statement is false and defamatory. In making the statement, Mr. Trump used his national and international audience of millions of people to make a false factual statement to denigrate and attack Ms. Clifford. Mr. Trump knew that his false, disparaging

3

statement would be read by people around the world, as well as widely reported, and that Ms. Clifford would be subjected to threats of violence, economic harm, and reputational damage as a result.

18.     At the time Mr. Trump made the statement, Mr. Trump knew his statement was false or was made with reckless disregard for the truth or falsity of his statement.

19.     Mr. Trump's false statement about Ms. Clifford is defamation *per se* because, among other things, it charged Ms. Clifford with committing a serious crime.

20.     Ms. Clifford has suffered damage as a result of Mr. Trump's false and defamatory statement in an amount to be proven at trial but in excess of $75,000.

## CAUSE OF ACTION FOR DEFAMATION

21.     Plaintiff restates and re-alleges each and every allegation in Paragraphs 1 through 20 above as if fully set forth herein.

22.     On or about April 18, 2018, Mr. Trump made the above mentioned false statement regarding Ms. Clifford, her account of the 2011 threatening incident, and the sketch of the man who threatened her: "A sketch years later about a nonexistent man. A total con job, playing the Fake News Media for Fools (but they know it)!"

23.     Mr. Trump's statement was made in writing online and released by Mr. Trump with the intent that it be widely disseminated and repeated. Indeed, Mr. Trump knows that his personal Twitter account has an audience of over 50 million followers and that the Twitter post would be repeated and reported upon by other news and media outlets online, in print, and on television and radio.

4

24.     Mr. Trump's defamatory statements clearly identified Ms. Clifford and the statement was made in response to Ms. Clifford releasing the sketch.  It was apparent on its face to those who read the statement that Mr. Trump's defamatory statement was about Ms. Clifford.

25.     Mr. Trump's statement was defamatory *per se*.

26.     The plain import of the statement is an attack on the truthfulness of Ms. Clifford and is reasonably understood to state that Ms. Clifford is lying about the threatening encounter and the sketch of the man responsible.

27.     Moreover, by calling the incident a "con job" Mr. Trump's statement would be understood to state that Ms. Clifford was fabricating the crime and the existence of the assailant, both of which are prohibited under New York law, as well as the law of numerous other states

28.     Thus, both on its face, and because of the facts and circumstances known to persons who read or heard the statement, it was apparent that Mr. Trump meant to convey that Ms. Clifford is a liar, someone who should not be trusted, that her claims about the threatening encounter are false, and that she was falsely accusing the individual depicted in the sketch of committing a crime, where no crime had been committed.

29.     Mr. Trump's defamatory statement was false because Ms. Clifford was in fact threatened in 2011 as she has recounted and the sketch was the result of her recollection regarding the appearance of the assailant.

30.     Mr. Trump made his statement either knowing it was false, had serious doubts about the truth of his statement, or made the statement with reckless disregard for its truth or falsity.

31.     Given the circumstances surrounding the threatening incident in 2011, namely that Ms. Clifford had not at the time gone public with her story and very few people knew of the possible In Touch story, it is reasonable to infer that the person who threatened Ms. Clifford could

5

have only been acting directly or indirectly on behalf of Mr. Trump and/or Mr. Cohen. Thus, Mr. Trump may have actual knowledge of the incident and of the falsity of his statement.

32.     Alternately, if Mr. Trump in fact had no direct or indirect connection to the incident, then Mr. Trump necessarily acted in reckless disregard of the truth or falsity of his statement because he would have no way of knowing one way or the other as to whether the incident occurred. Nevertheless, and in spite of this, he chose to defame and disparage Ms. Clifford to his audience of over 50 million Twitter followers and many more worldwide.

33.     Mr. Trump's statement exposed Mr. Clifford to hatred, contempt, ridicule, and shame, and discouraged others from associating or dealing with her.

34.     As a result, Ms. Clifford has suffered damages in an amount to be proven at trial, including but not limited to, harm to her reputation, emotional harm, exposure to contempt, ridicule, and shame, and physical threats of violence to her person and life.

35.     In particular, since the statement, Ms. Clifford has been exposed to death threats and other threats of physical violence, causing her both emotional and economic damages.

36.     By way of example only, Ms. Clifford has had to retain the services of professional bodyguards and other protective services to ensure her personal safety.

37.     Ms. Clifford's damages exceed $75,000.

38.     In making the defamatory statement identified herein, Mr. Trump acted with malice, oppression, or fraud, and is thus responsible for punitive damages in an amount to be proven at trial according to proof.

## PRAYER FOR RELIEF

1.      Compensatory damages in an amount to be proven at trial;

2.      Punitive damages;

3.      Pre-judgment and post-judgment interest;

4.      Costs of suit; and

5.      For such other and further relief as the Court may deem just and proper.


## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all causes so triable.


Dated: April 30, 2018
        Greenwich, CT



                                /s/ Catherine R. Keenan
                                Catherine R. Keenan, Esq.
                                Federal Bar No. CK5925
                                66 Field Point Road
                                Greenwich, CT 06830
                                Tel: (203) 661-4200
                                Fax: (203) 661-3666
                                E-Mail: efile@greenwichlegal.com

                                AVENATTI & ASSOCIATES, APC
                                Michael J. Avenatti (*Pro Hac Vice*
                                application forthcoming)
                                520 Newport Center Drive, Suite 1400
                                Newport Beach, CA 92660
                                Tel: (949) 706-7000
                                E-Mail: mavenati@eoalaw.com

# EXHIBIT C

1

I5u2cohC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      In the Matter of Search Warrants
 3    Executed on April 9, 2018
      ------------------------------x
 4    MICHAEL D. COHEN,

 5                   Plaintiff,

 6           v.                           18 MJ 3161

 7    UNITED STATES OF AMERICA,
                                          Conference
 8                   Defendant.

 9    ------------------------------x
10                                        New York, N.Y.
                                          May 30, 2018
11                                        10:30 a.m.

12    Before:

13                      HON. KIMBA M. WOOD,

14                                        District Judge

15                          APPEARANCES
16
      MCDERMOTT WILL & EMERY LLP
17         Attorneys for Plaintiff
      BY:  TODD HARRISON
18         STEPHEN M. RYAN
           JOSEPH B. EVANS
19

20    ROBERT S. KHUZAMI
           Acting United States Attorney for
21         the Southern District of New York
      THOMAS A. McKAY
22    RACHEL A. MAIMIN
      NICOLAS ROOS
23    ANDREA GRISWOLD
           Assistant United States Attorneys
24

25
```

I5u2cohC

1  Also Present:

2

3  SPEARS & IMES LLP
        Attorneys for Intervenor
        Donald J. Trump, President
4  BY:  JOANNA C. HENDON

5

6  LAW OFFICES OF ALAN S. FUTERFAS
        Attorneys for Intervenor
        The Trump Organization
7  BY:  ALAN S. FUTERFAS
        ELLEN RESNICK

8

9  MICHAEL AVENATTI
        Attorney for Interested Party
10        Stephanie Clifford a/k/a "Stormy Daniels"

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I5u2cohC

1           (Case called)

2           THE DEPUTY CLERK:  Counsel, please state their

3    appearances.

4           MS. MAIMIN:  Good morning, your Honor.  Rachel Maimin,

5    Thomas McKay, Andrea Griswold, and Nicholas Roos for the

6    government.

7           THE COURT:  Good morning.

8           MR. HARRISON:  Good morning, your Honor.  Todd

9    Harrison, Steve Ryan, and Joseph Evans for Michael Cohen.

10          THE COURT:  Good morning.  And good morning,

11   Mr. Cohen.

12          MS. HENDON:  Good morning, your Honor.  For the

13   president intervenor, Joanna Hendon, Chris Dysard, and Reed

14   Keefe.

15          MR. FUTERFAS:  Good morning, your Honor.  For Trump

16   Organization, Alan Futerfas and Ellen Resnick.

17          THE COURT:  Good morning.

18          MR. AVENATTI:  Good morning, your Honor.  Michael

19   Avenatti on behalf of proposed intervenor, Ms. Daniels.

20          THE COURT:  Good morning.

21          I will begin by seeking the government's update on its

22   production of material.

23          MS. MAIMIN:  Yes, your Honor.

24          As reflected in the report of the special master dated

25   yesterday, we completed our rolling production of material to

I5u2cohC

1    Mr. Cohen and the special master on May 22 with the exception

2    of three items, namely, two BlackBerries that Quantico is still

3    working on getting into and the contents of a shredding machine

4    which we expect to produce within two to three weeks.

5            THE COURT:  Very good.

6            Do you have any idea of the possible volume of

7    materials that represents?

8            MS. MAIMIN:  The BlackBerries we can't be certain

9    because we are not in them, so we can't tell the volume of

10   electronic material.  I don't believe the contents of the

11   shredding machine are voluminous at all.

12           THE COURT:  Okay.  Thank you.

13           Mr. Cohen's production of portions of material to the

14   intervenors, who would like to address that?

15           MR. HARRISON:  I will address that, your Honor.

16           THE COURT:  Mr. Harrison.

17           MR. HARRISON:  Thank you, Judge.

18           So as the court is aware, the court originally set

19   this date as a control date for ten business days after we had

20   received everything.  We have been receiving rolling

21   productions from the government.  As you heard, our last

22   receipt of materials was on May 22.  There are still some

23   outstanding items, but we have been tackling things as soon as

24   they come in.  We have got people working diligently on them,

25   your Honor.

I5u2cohC

1          Just to run quickly through the process of what we

2   have done, the first thing we did was make sure all the parties

3   were on the same page as to control numbers, and that required

4   us to take the data from the government, run it through our

5   systems, assign control numbers to everything, and then give a

6   copy of that back to the government so they had control numbers

7   and a copy to the special master, as well.  So that was

8   something that took some time and effort on our part.

9          Subsequent to that or at the same time, we received

10  over 3.7 million files from the government, your Honor.  We

11  have gone through about 1.3 million of those, so about a third

12  of them.  So we are really tackling this diligently, and we are

13  making pretty good progress on that.

14          Some of that initial time was spent on processing and

15  uploading all that data, the large amounts of data, and then we

16  tackled it and started reviewing it.

17          We have made six sets of privilege designations to the

18  special master so far, and at the same time we have been

19  searching for and producing -- making productions to lawyers

20  for the president and lawyers for The Trump Organization.  So

21  that's also a process that we have to go through that we have

22  people working on.  We have made nine productions so far to the

23  lawyers for the president and The Trump Organization.  So

24  that's just taken a lot of time and effort, Judge.  We have got

25  people working all night, weekends, etc., etc.  So we are

I5u2cohC

1    making pretty good progress.

2           THE COURT:  Can you give me a feeling for the volume

3    of documents for each production you mentioned now.

4           MR. HARRISON:  For each production that we have

5    received from the government, your Honor?

6           THE COURT:  That you received and reviewed.

7           MR. HARRISON:  Well, we have received about 3.7

8    million files from the government, your Honor, and we have gone

9    through about 1.3 million of them, so we are about a third of

10   the way through the materials that we have received from the

11   government.

12          THE COURT:  All right.  Is there any distinction

13   between how difficult it is to review one production as opposed

14   to another?

15          MR. HARRISON:  Yes.  Certainly, Judge.  The hard copy

16   productions are relatively easy to review.  The mobile data,

17   which there has been a lot of, we have received information

18   from 13 separate mobile devices.  That takes a long time to

19   upload.  It takes a long time for us to review because of the

20   format of the UFED reports that we received from the government

21   in relation to mobile devices.  So that's been the majority of

22   the information so far, and that is the most difficult to

23   process and to review, but we have gotten through a lot of

24   those devices already.

25          There are also, we received 19 digital media devices,

I5u2cohC

1  like hard drives, thumb drives, and things like that.  That is

2  easier to upload and easier to review than mobile devices, but

3  still, you know, a somewhat laborious process, your Honor.

4        THE COURT:  By approximately what point in time do you

5  expect to have reviewed the remainder of the files the

6  government has already sent you?

7        MR. HARRISON:  Based on the volume that we have gotten

8  so far, Judge, and the fact that we have gotten through about a

9  third of it, I estimate -- and it's a little bit hard to

10  estimate, but we estimate that we will be done fully with the

11  review approximately mid July.  So we were going to suggest to

12  the court if you wanted to put control date on for 30 days from

13  now, that might be a good idea.

14        THE COURT:  Let me hear from the government as to the

15  reasonableness of this proposed deadline.

16        MS. MAIMIN:  We don't believe that this is a

17  reasonable deadline.  As the defense counsel just stated, the

18  material is already loaded.  Our production was complete as of

19  May 22.  The UFED reports are actually produced in that format

20  because they are easy to review and are in a format that

21  facilitates a quicker review.  One of our concerns, as the

22  court is aware from the beginning, is delay, and that is an

23  unreasonable delay.

24        THE COURT:  What, in your view, would be reasonable,

25  given your familiarity with the material?

I5u2cohC

1          MS. MAIMIN:  Mid June, your Honor.

2          THE COURT:  All right.  Now, as counsel has pointed

3     out, the reason for this conference initially was to see

4     whether the special master review is proceeding almost as

5     quickly as a taint team review would or whether it is taking

6     much longer.  It sounds as if it is taking much longer and as

7     if we may have to revert to the taint team unless Mr. Cohen's

8     lawyers can put enough in the way of resources into this to be

9     finished with the current production by mid June.

10          MR. HARRISON:  Well, Judge, we will do whatever we

11     have to do, but I will say that that's an unreasonable deadline

12     the government has set.  And if the government was reviewing

13     this stuff, they wouldn't have been through it in this amount

14     of time either.  And the government has not proffered any

15     reason why they think that our date is unreasonable.  They just

16     think it is unreasonable because they want the stuff faster,

17     and I understand that, but we are moving heaven and earth.  We

18     have people working all night.  We have people sleeping on

19     couches in our offices.  We have people who worked all through

20     the Memorial Day weekend.  I had an associate yesterday who

21     felt a tremor in his hand from lack of sleep.  I had to send

22     him home late last night.  He came back at 7:30 this morning.

23     We are working around the clock.

24          The government knows that this stuff takes time to

25     review.  They know what they have given us.  They know the

I5u2cohC

1   types of media and things that they have given us.  They know

2   that this takes time to review.  Whatever date we say, Judge,

3   they were going to say they want it sooner than that, say our

4   date was unreasonable.  So I don't think they have really

5   proffered any reasons as to why our suggested date is

6   unreasonable, and I can assure the court that we are working

7   around the clock.  We are working as fast as we can.  This

8   stuff takes a while to get through.

9           THE COURT:  How many lawyers are working on this

10  full-time?

11          MR. HARRISON:  15, your Honor.

12          THE COURT:  Full-time?

13          MR. HARRISON:  15 plus two, yes, data folk, two data

14  specialists.

15          THE COURT:  And they are all working full-time on

16  this?

17          MR. HARRISON:  Yes, Judge.

18          THE COURT:  Ms. Maimin.

19          MS. MAIMIN:  Your Honor, as I mentioned before, so

20  much of the time -- and I think defense counsel said this,

21  too -- that caused delay initially was the loading of the

22  documents.  That is complete.  We can see that the special

23  master is reviewing material quite expeditiously as it is

24  received, and we believe that Mr. Cohen and the intervenor

25  should be held to the same standard.

I5u2cohC

1    THE COURT: I think that's correct. The special

2    master is reviewing everything quite quickly, and I think that

3    counsel could do that if they put enough of the right type of

4    resources into it. So by mid June you need to have finished

5    the balance of the production that you have to date.

6    MR. HARRISON: I understand, your Honor. I will just

7    point out that we have a lot of other tasks that the special

8    master doesn't have. The special master is doing a great job,

9    working very diligently, but we also have to do searches for

10   the lawyers for the president and searches for lawyers for The

11   Trump Organization, make productions to them. As I mentioned,

12   we had to spend a certain amount of time making sure that

13   everybody was on the same page with control numbers, so we had

14   to run all the data, give it control numbers, and give a copy

15   back to the government, give a copy of that to the special

16   master, so everyone is on the same page. So we have been sort

17   of the central repository for everything, which we are not

18   complaining about, but there are a lot of extra tasks that we

19   have and that the government doesn't have and that the special

20   master doesn't have. So there is a lot of other stuff that we

21   have to do.

22   THE COURT: Much of it you have already done.

23   MR. HARRISON: A lot of that has already been done,

24   Judge, but the review itself just takes time. It takes time.

25   THE COURT: Okay. Mid June is the date.

I5u2cohC

1          Now, did the government say that you have handed over
2     everything other than two types of material?
3          MS. MAIMIN:  Yes, your Honor, two BlackBerries and the
4     contents of the shredder.
5          THE COURT:  Okay.  If you had Mr. Cohen's assistance,
6     could you get right into the BlackBerry?
7          MS. MAIMIN:  I'm not certain, your Honor.  We are
8     working through that.  But it is my understanding that these --
9     that Mr. Cohen may not have the necessary information to get
10    into the BlackBerries at this time.
11         MR. HARRISON:  Judge, those are really old items.
12    There may not even be any information or any relevant
13    information on them, and we don't have any information to
14    assist the government in that.
15         THE COURT:  All right.  Is there any way of dating
16    them, where they were kept, in his office or home or hotel,
17    Mr. Harrison?
18         MR. HARRISON:  I'm sorry.  I couldn't hear you, your
19    Honor.
20         THE COURT:  Is there any way of dating, D-A-T-I-N-G,
21    the material in the BlackBerries?  You say it is very old.  Can
22    you give me any more than that?
23         MR. HARRISON:  Let me make an effort, Judge.  Hang on
24    one second.
25              (Mr. Harrison and Mr. Cohen confer)

I5u2cohC

1          MR. HARRISON:  Judge, I have had this discussion

2     before, but I just wanted to double check.  So our best

3     estimate is that those devices are at least eight years old,

4     and we believe that one of them, maybe both of them, belong to

5     Mr. Cohen's wife.  And we are talking about the two BlackBerry

6     devices, as I understand.

7          THE COURT:  Has the government attempted to have

8     Mr. Cohen's wife assist in opening them?

9          MS. MAIMIN:  No, your Honor.  We were not aware that

10    Ms. Cohen may have owned the BlackBerries.  But we are happy to

11    work with defense counsel to see if that would facilitate

12    production.

13         THE COURT:  It would have been helpful if Mr. Cohen's

14    lawyers had given the government this information some time

15    ago.

16         MR. HARRISON:  Sorry.  Just so it is clear, we don't

17    have any information to give them.  We had this discussion with

18    the government very early on.  We gave them all of the

19    information related to those issues that we could.  We don't

20    have any more information to give them.  We haven't been

21    holding anything back from them.

22         THE COURT:  Ms. Maimin said that she just learned that

23    the BlackBerries may belong to Mr. Cohen's wife.

24         Am I right?

25         MS. MAIMIN:  Yes.  I don't believe we were previously

I5u2cohC

1   aware of that.

2          MR. HARRISON:  I do believe we had discussion about

3   that early on, Judge.  We might not have been sure.  In fact, I

4   don't know that we are 100 percent sure right now, as I

5   indicated, that those are Mr. Cohen's wife's.  That's our

6   belief.  That's our best guess.  They are so old that we don't

7   know for sure.

8          THE COURT:  All right.  Would any of the intervenors

9   wish to be heard on document production?

10         MS. HENDON:  Your Honor, I would just say that, from

11  the perspective of the president, the rate at which we see the

12  government providing material to Mr. Cohen and Mr. Cohen

13  providing it to us, we are very satisfied and pleased with that

14  and the rate at which we are receiving material and able to

15  make our privilege designations, and we remain very grateful to

16  the court for implementing this process.

17         THE COURT:  Thank you.

18         MR. FUTERFAS:  Your Honor, I would just echo those

19  remarks.  When you receive the materials and start going

20  through it, you see how intensely you do have to look at it to

21  make real privilege reviews.  We are making those privilege

22  notations in a very, very limited, narrow, careful scope, which

23  I think the special master appreciates.  But when you get into

24  that process, you see how much work that Mr. Cohen's lawyers

25  are doing, and we appreciate and know how hard they are working

I5u2cohC

1    to accomplish this process, and we also are appreciative to the

2    special master for her role.  She has been very helpful in

3    moving this forward.  So I would add that.

4              THE COURT:  Very good.  Okay.

5              Mr. Avenatti has asked that I address your pending *pro*

6    *hac vice* motion.  Mr. Cohen's lawyers ask that it be held in

7    abeyance to the extent that the motion to intervene is also in

8    abeyance.

9              Let me first ask the government, do you still have a

10   position on this or do you take no position on either motion?

11             MS. MAIMIN:  We take no position on the *pro hac vice*

12   motion; and, as stated in our letter to the court, we are not

13   taking a position at this time on the motion to intervene.

14             THE COURT:  All right.

15             Mr. Avenatti, I will be glad to hear you.  I have your

16   motion and your affidavits.

17             MR. AVENATTI:  May I approach the podium, your Honor?

18             THE COURT:  Yes.

19             MR. AVENATTI:  Your Honor, thank you.

20             I am not going to repeat what has been stated in the

21   papers as well as the supplemental affidavits that have been

22   filed with the court.

23             Let me first address the motion to intervene.  We have

24   no issue and we agree with the government that that should be

25   held in abeyance.  We are continuing to have communications

I5u2cohC

1    with the government as to whether it will ultimately be

2    necessary for us to intervene.

3          Part of the issue, your Honor, or one of the issues

4    that bears on that is an item that we requested be taken up in

5    the agenda relating to these audio recordings that we have

6    become aware of that may reflect attorney-client privileged

7    communications between my client and her former counsel,

8    Mr. Davidson.

9          THE COURT:  What is your information on that?  You

10   have alluded to it in general, but --

11         MR. AVENATTI:  Your Honor, I received a call last week

12   from a member of the press who asked me to comment on an audio

13   recording that the member of the press had evidently heard.  It

14   was an audio recording between Mr. Cohen and Mr. Davidson, my

15   client's former counsel.  During that discussion, Mr. Davidson

16   disclosed attorney-client privileged communications that he had

17   with my client.

18         Needless to say, this was a very disturbing call for

19   me to receive, asking for comment on (a) an audio recording

20   that appears to have been made by Mr. Cohen without permission

21   by Mr. Davidson from all indications, and (b) why would

22   Mr. Davidson be communicating with Mr. Cohen about

23   attorney-client privileged communications that he was having

24   with Ms. Clifford?  And why would that then be recorded?  And

25   why would a member of the press be provided access to that

I5u2cohC

1  recording?

2          Now, there are only two places, by my estimation, your

3  Honor, that that could have been or two sources for that

4  information:

5          One, it would have to be the F.B.I. or the U.S.

6  Attorney's office.  They would have access to it if it was

7  obtained in the raid.  I don't believe for one moment, your

8  Honor, that either of those two organizations or entities

9  provided that information to this reporter.  I would be

10  shocked, based on my workings with the U.S. Attorney's office

11  over the last few weeks and how cooperative those

12  communications have been, if anyone from their office would

13  have leaked that to the press.  I would be absolutely shocked.

14          So, therefore, that had to have come, from our

15  estimation, your Honor, from Mr. Cohen or someone associated

16  with Mr. Cohen who provided that to the press recently in an

17  effort to paint a false narrative about my client or

18  Mr. Davidson or for some other reason.

19          But, your Honor, it makes no sense to me as to why a

20  recording would have (a) been made, (b) why Mr. Davidson would

21  have disclosed attorney-client privileged communications

22  without the consent or knowledge of my client -- and I can

23  assure you, your Honor, that my client at no point in time

24  waived the privilege or informed Mr. Davidson that such

25  information could be provided to Mr. Cohen -- and, lastly, your

I5u2cohC

1    Honor, it is very disturbing to me that I don't have access to

2    the recording.  I don't know -- my understanding is, from what

3    I was told, there are other recordings between Mr. Cohen and

4    Mr. Davidson relating to my client and attorney-client

5    privileged information.

6           Obviously we want to take steps, your Honor, to

7    protect this information.  We don't want it provided to the

8    press.  We need to be able to make a determination ultimately

9    as to whether to waive privilege relating to communications

10   between my client and Mr. Davidson.  But as you might imagine,

11   your Honor, all of this was very surprising and disturbing to

12   me, as Ms. Clifford's current counsel.

13          THE COURT:  You are essentially participating in this

14   proceeding.  It seems to me you have no standing to make these

15   points unless you want to intervene.

16          MR. AVENATTI:  And, your Honor, I understand that.  I

17   am only providing that by way of background to tell you that we

18   are happy to delay our motion to intervene, in accordance with

19   the request by the government, as we work through these issues.

20   But sooner rather than later, that's going to have to be teed

21   up, especially if we continue to learn of potential

22   attorney-client privileged information that was provided by

23   Mr. Davidson to Mr. Cohen.  That's my only point, your Honor.

24          THE COURT:  All right.

25          MR. AVENATTI:  Your Honor, as it relates to the *pro*

I5u2cohC

1   *hac vice* application, your Honor, it is highly unusual for such

2   an application to be denied.  I'm sure your Honor is well aware

3   of that.  It is highly unusual for there to be opposition to

4   that application.  I have had the benefit of reading the

5   opposition to the application.  A lot of it relates to matters

6   that are completely irrelevant to these proceedings, have

7   nothing to do with these proceedings.

8         The argument relating to the release of the

9   information concerning Mr. Cohen, there has been no linkage

10  between that information and this proceeding, your Honor.

11  There is no allegation that that information has anything to do

12  with this proceeding whatsoever.  This proceeding, currently

13  it's not a criminal case.  It is not a civil case *per se*.  It

14  is an *"in re"* proceeding relating to the seizure of documents.

15        Furthermore, your Honor, any claim that somehow

16  extrajudicial statements have had any bearing on this matter or

17  have any potential bearing on this matter, your Honor, I do not

18  believe those arguments are well taken for the following

19  reason:  There is no jury in this proceeding.  There is no

20  trial in this proceeding.  This proceeding is a proceeding,

21  like I just stated, about documents and how documents are going

22  to be handled and how particular privilege issues are going to

23  be addressed by way of a special master, etc.  Your Honor

24  ultimately makes the determination, together with

25  recommendations from Judge Jones, relating to how those

I5u2cohC

1   documents are to be addressed and how those documents are to be

2   handled.  Nothing that may be said in the press could

3   potentially have any bearing on any of those decisions.  Your

4   Honor has been on the bench for a very, very long time.  This

5   is not the first high-profile case your Honor has handled by

6   any stretch of the imagination.  Your Honor is used to handling

7   high-profile matters.  Your Honor is used to have extensive

8   media coverage relating to those matters.  So nothing that

9   could be said in connection with any statements outside of this

10  courtroom could have any bearing on your Honor's ultimate

11  determination.

12          Now, as it relates to my fitness, I have never been

13  disciplined by any bar organization in the United States, no

14  state bar disciplinary record whatsoever.  I have been an

15  exemplary member of the bar for 18 years.  I have practiced

16  around this country in various state and federal courts.  I

17  have tried cases in no fewer than nine different states.  I

18  have an exceptional track record.

19          And if your Honor would like to hear me address any

20  particular statements or allegations from Mr. Cohen's counsel

21  as to why my *pro hac* should not be granted, I would be more

22  than prepared to address those, your Honor.

23          THE COURT:  Granting your motion *pro hac* doesn't, as

24  you know, give you a roving ability to bring up anything you

25  wish in connection with this matter.  You would be in here to

I5u2cohC

1    protect your client's rights.  To the extent that the special

2    master might become involved in reviewing purportedly

3    privileged materials and making a determination in consultation

4    with you, the parties have been sharing the cost of the special

5    master 50/50.  In reviewing the material from the JAMS

6    arbitration, that left some question in my mind about whether

7    you would in fact share something that you say you will share.

8            MR. AVENATTI:  Well, your Honor, let me put the

9    court's concern at ease.  There is no question whatsoever, your

10   Honor, that if the special master spends any time working on

11   anything relating to Ms. Clifford, we are more than happy to

12   pay the special master's fees and costs associated with that.

13   If need be, we are happy to put a retainer up of whatever the

14   special master deems appropriate.

15           I noted in the statement filed by the special master,

16   Judge Jones, she is billing at $700 an hour, which I found to

17   be incredibly reasonable, your Honor.  Based on her experience,

18   not only on the bench but as an attorney, I thought that was

19   exceptionally low, quite honestly, at least based on my

20   experience with New York and Los Angeles rates.

21           So, again, your Honor, let me put the court at ease.

22   We will be happy to advance whatever retainer the court deems

23   appropriate, depending on how much time is estimated as it

24   relates to reviewing those documents.  Again, it is tough for

25   us to say, because we don't know how many audio recordings

I5u2cohC

 1    there are.  We don't know how much information was provided.

 2    We are basically flying blind, your Honor.

 3              THE COURT:  Thank you.

 4              Would you like to respond, Mr. Ryan?

 5              MR. RYAN:  Thank you, Judge.

 6              Judge, this proceeding is about keeping confidential

 7    privileged information of the President of the United States,

 8    of Mr. Cohen, of the lawyers who have given advice to

 9    Mr. Cohen, and it is being turned on its head by Mr. Avenatti.

10              When he was here on April 26, he got up and spoke

11    three different times.  Not once did Mr. Cohen's lawyers rise

12    to address his *pro hac vice* motion or the motion to intervene,

13    not a word.

14              The reason I rise today is because I have never seen

15    an attorney conduct himself in the manner that Mr. Avenatti

16    has.  Earlier this month, he deliberately took information that

17    he knew was nonpublic, confidential information that was about

18    my client's bank records, that were likely -- almost an

19    ineluctable conclusion that came from a SAR report.  Those SAR

20    reports cannot be made public by the law enforcement officials

21    or by the banks who handle them.  He published that information

22    gratuitously.  He intended to prejudice and cause harm to my

23    client, and he did.  He succeeded in that.  The court would

24    have to take judicial notice of the volume of media attention

25    that was then devoted to it.  But what Mr. Avenatti did in

I5u2cohC

1    releasing those records was entirely reckless and improper.

2         The second thing that Mr. Avenatti did in that same

3    release is he improperly released the bank records of a

4    gentleman living in Tel Aviv and he improperly released a

5    Canadian aid worker, a distinguished civil servant of the

6    Canadian government, and his Toronto bank account.  It was a

7    drive-by shooting of anyone named Michael Cohen that he could

8    come up with the information.

9         And in the two things that he did, we came back the

10   next day intending to raise it to the court because we had

11   never seen anything like this.  I have practiced law for 37

12   years, and I have never risen to oppose the *pro hac vice* motion

13   of an attorney to practice law.  And Lord knows there are

14   people who I would rather not have been against in that time.

15   This is not -- the event that he is sidestepping is his

16   intentional, malicious, and prejudicial release of that

17   information.

18        Now, what have we learned since that came out?  Within

19   the day that I was actually filing the motion, the second day,

20   I had spoken to the Canadian aid worker, and we were able to

21   obtain the clarity that his records had been done.  We were

22   able, actually through the press, to obtain the Israeli

23   newspaper article.  We never spoke directly to that gentleman.

24   I spoke directly to the man in Tanzania, is outraged that his

25   records have been released.

I5u2cohC

1          On the same day, the Treasury inspector general

2     indicated there would be an inquiry by the inspector general's

3     office as to the likely release of the SARs reports.  So that

4     investigation is still going on.

5          Subsequent to that, your Honor -- and we put this in

6     the record to you -- there was an extraordinary *New Yorker*

7     article that quoted apparently, according to this press report,

8     the individual who had released it, who showed in his comments

9     that he knew that he had violated the law in releasing it.  And

10    of course no one in the press printed those bank records of my

11    client until Mr. Avenatti released it.  And I'm going to put

12    on -- upon information and belief, my phone rang off the hook

13    the day before during the day that that release was done.  He

14    released that document under embargo to at least three

15    different entities.

16         So if we want to talk about leaks to the media, that

17    document was made available to a television network and print

18    journalists to prepare their stories for his release that

19    night.  It was a premeditated drive-by shooting of my client's

20    rights.  That's why we are here today raising this issue.

21         Now, what have we learned subsequently?  Within the

22    past week, not something we did, not something we had anything

23    to do with, a United States bankruptcy court has issued a

24    judgment against the named partner's law firm, Avenatti &

25    Eagan, for $10 million.  But in the course of that, your Honor,

I5u2cohC

 1    I want to read a couple of quotes from other judges about the

 2    conduct of that case.  I'm going to refer for a moment to the

 3    Florida bankruptcy judge, and the court can find the document I

 4    am reading from, it is exhibit -- it is document 66-2.  I'm on

 5    lines 12 and 13.  And the bankruptcy judge in Florida addressed

 6    the fact that a filing was made in that bankruptcy court that

 7    says, "We have an involuntary case that has a stench of

 8    impropriety."  Okay?  This is one of your brethren, a judge of

 9    the United States, who had to make that ruling.

10         And who did that filing benefit?  Well, it benefited

11    Mr. Avenatti.  He was scheduled to have his deposition taken

12    and to provide evidence, and he didn't have to do that because

13    of the stay.

14         So when we look from place to place, what's the

15    importance of that?  The importance of it is that Mr. Avenatti

16    cannot keep his agreements.  He didn't pay the money that he

17    agreed to pay to settle this matter.

18         We know that he is involved in ways that call

19    attention to himself, his 170 appearances on television -- 74

20    on CNN, according to a recent report.  This is about the

21    aggrandizement of a single attorney and his client that, while

22    they may have a motion in this case that should be heard with

23    respect and that we didn't rise to oppose when it first came

24    here, but I'm rising now because I can't believe that we are

25    going to allow this court in the Southern District of New York

I5u2cohC

1    to be treated this way.  It is not appropriate, your Honor.

2            It shakes me to my boots that, at this point in my

3    career, I have to rise to oppose this sort of conduct, which is

4    laid out.  We have not come in here and provided hearsay about

5    a reporter who called him.  If we had released those audiotapes

6    to a reporter, it would have been the biggest story in America.

7    It has not occurred.  The audiotapes that we have, if any, that

8    pertain to him, under lock and key, they are controlled by my

9    law firm, TO, and POTUS, to the extent that there may be a

10   claim of privilege related to them.  I am unaware of any

11   release of an audio file of this kind.

12           Now, let me address this further.  I think what he has

13   done today is rise to try and equate our behavior, but we are

14   not squabbling children.  And I know sometimes when lawyers get

15   up and they fight like this in front of a court, we look that

16   way, but it's not true.  Because this goes to the very heart of

17   what his intention is in this representation.  His release of

18   the bank secrecy issues, candidly, he shouldn't be asking us to

19   answer questions, he should be asked to answer those questions

20   himself.

21           I apologize for the vehemence that I have approached

22   this this morning, your Honor.  I think this is wrong, and I

23   had to rise.  I really didn't want to do this.  But it is an

24   issue now put before the court, and I think the appropriate

25   way -- there is a very strange thing going on in terms of any

I5u2cohC

1   discussions between the government and him, strange bedfellows,

2   perhaps, but we haven't intervened in that.  They said the

3   motion is not here.  I would urge you to tell -- hold his

4   application in abeyance because who knows what's going to trick

5   out next week.  Who knows what we are going to read, given the

6   role of the inspector general, given the issues in the

7   bankruptcy case.  There is really no reason to rule today on

8   this.  I would respectfully request the court take the matter

9   under advisement.  If we are going to go forward with the

10  motion, then the court will have heard us and you could rule at

11  that time.

12          I thank you for hearing me.

13          THE COURT:  Thank you.

14          Mr. Avenatti, do you wish to respond?

15          MR. AVENATTI:  Yes, your Honor.

16          That was quite the tale --

17          THE COURT:  Let's not comment on it.

18          MR. AVENATTI:  Your Honor, what Mr. Ryan just stated

19  to the court, 95 percent of it is without any evidentiary basis

20  whatsoever.  There is no evidence that we engaged in any

21  improper conduct relating to the release of any documents

22  relating to Mr. Cohen.  There is no evidence of that.  And the

23  reason why that is true, your Honor, is because we did not.  We

24  did not do anything improper relating to the release of

25  information concerning Mr. Cohen; and, in any event, that has

I5u2cohC

1   nothing to do with this proceeding or with the standards under

2   which we can be admitted -- I can be admitted *pro hac vice*.

3   There is no evidence that we did anything improper, your Honor.

4   There is no evidence that the inspector general is

5   investigating me or our release of the information.  There is

6   no evidence of that whatsoever.  We haven't been contacted by

7   the inspector general.  We haven't been contacted by anyone

8   associated with the government.  We haven't been contacted by

9   the F.B.I.  We haven't been contacted by the Treasury

10  Department.  We have been contacted by no one -- no one, your

11  Honor -- relating to anything that we have released.

12          THE COURT:  I've a different view from you, from the

13  one you have expressed earlier as to what it is that would

14  subject you to the standards for professional responsibility in

15  this court.

16          In my view, this matter, which is a potential

17  precursor to a criminal trial if charges are filed against

18  Mr. Cohen, I believe that once you are participating in this

19  proceeding, you are subject to New York Code of Responsibility

20  3.6 and the local rule for the Southern District of New York

21  23.1.  That means that you would have to stop doing some things

22  you have been doing.  If you participate here, you would not be

23  able to declare your opinion as to Mr. Cohen's guilt, which you

24  did; you would not be able to give publicity to documents that

25  are not public.  It would change your conduct.  That is my only

I5u2cohC

1    possible role in doing what Mr. Cohen's lawyers want, which is,

2    to essentially stop in its tracks your publicity tour on TV and

3    elsewhere.  And I say "publicity tour" not in a derogatory

4    sense.  You are entitled to publicity so long as -- that is, I

5    can't stop you, unless you are participating in this matter

6    before me.

7              So I either want you to participate or not be in the

8    matter at all.  I don't want you to have some existence in a

9    limbo, where you are free to denigrate Mr. Cohen and I believe

10   potentially deprive him of a fair trial by tainting a jury

11   pool.  I know a jury, if there is one, is way down the road,

12   and memories certainly may fade, but this conduct is inimicable

13   to giving Mr. Cohen eventually a fair trial.

14             So unless you want to move to intervene, in which case

15   you will be subject to all of these rules as well as this

16   court's grievance committee, then I will hold in abeyance your

17   motion *pro hac vice*, and you will not be permitted to use this

18   court as a platform for anything because you won't be a

19   participant in it.

20             MR. AVENATTI:  And, your Honor, I don't believe that I

21   have done that, quite honestly, your Honor.  And we are the

22   ones that -- I am the one that asked that the agenda item be

23   placed on the agenda for consideration by your Honor, because

24   we don't want to be in limbo *per se*, your Honor.

25             Now, Mr. Cohen's counsel, they are the ones that

I5u2cohC

1    oppose the court taking up my *pro hac vice* application today as

2    set forth on the agenda, to be clear.  So I ask that the court

3    pass judgment on the *pro hac vice* application today.

4              THE COURT:  I don't think that makes you a

5    participant.  You would have to --

6              MR. AVENATTI:  I agree.

7              THE COURT:  You would have to move to intervene, and

8    you have no particular portfolio to intervene here unless it is

9    Ms. Clifford's rights that you are protecting.

10             MR. AVENATTI:  Your Honor, I understand that.  If the

11   court -- if it is the court's inclination to hold the *pro hac*

12   pending the motion to intervene decision or hearing, so be it.

13   That is more than acceptable to us.  We are continuing to work

14   with the government.

15             Your Honor, I will note that now my concerns have been

16   confirmed.  Mr. Ryan states there are recordings relating to my

17   client.  They are under lock and key.  He stated that on the

18   record.  So that's now been confirmed.  So that raises

19   considerable concerns.  I will digest those concerns.  We will

20   move appropriately.  But if there are recordings of my client's

21   former counsel disclosing attorney-client privileged

22   information, that is of significant concern to me and my

23   client.  And we will address that with the government, and we

24   will attempt to arrive at a resolution, your Honor.

25             THE COURT:  Very good.  Thank you.

I5u2cohC

1          Is there anything that we should take up in addition?

2          MS. MAIMIN:  Your Honor, we would just respectfully

3    request that the court set a specific date in mid June for the

4    completion of Mr. Cohen's review.

5          MR. RYAN:  Your Honor, could I be heard for one

6    minute?

7          THE COURT:  Yes.

8          MR. RYAN:  I want the court to understand something

9    about the materials that we are dealing with.  For example, if

10   there is an hour-long conversation that's one of the 3.7

11   million files, one of our attorneys has to listen to that hour

12   in order to do that or the TO or presidential lawyers have to.

13   I don't think I can maintain quality control of a larger staff

14   of attorneys working on this matter than we currently have.  We

15   are burning money at a rate, candidly, that I don't know that I

16   can even increase.

17         THE COURT:  I'm prepared to turn this over to a taint

18   team which I view as fair.

19         MR. RYAN:  But, your Honor, the 1.3 million records

20   that we are through is a demonstration of how hard we have

21   worked.  We are working flat out.  And, candidly, it was only

22   on the 22nd that we obtained some of the latest devices that we

23   have gotten and put them up.  We are doing, candidly, a great

24   job on this, and I don't think we could do more.  I don't think

25   it would be either fair or appropriate.  The court faced this

I5u2cohC

1    decision of what would be fair and appropriate.  The special

2    master process is working perfectly.  But an unrealistic

3    deadline of mid June, I don't know that we can make that.  And

4    I just want the court to understand, I just don't know that we

5    can do that.

6         I would ask the court's indulgence to not accept that

7    date.  Bring us back that date, and let us give you a report.

8    Let the special master report to you on that date of where we

9    are.  I hear you that you want this done.  And, you know, we

10   have tried to get a process that worked for that, and I just

11   ask the court to consider that in her ruling.

12        THE COURT:  What I am considering in addition is the

13   fact that the special master is able to keep up with the

14   production with herself, I believe a partner, and perhaps a few

15   others.  They don't have an army.  They don't have people

16   sleeping on couches.  They are able to speed up in a way that

17   you are apparently not able to do.

18        MR. RYAN:  I think I need to address that.  The

19   special master can correct this or my colleagues can correct it

20   in the government or the intervening parties.

21        The special master initially was reviewing documents

22   the same way we were, reviewing all of them.  At this point I

23   think the special master, while spot-checking things, is

24   actually reviewing the privilege claims that we are making and

25   then some extra things.  Her staff is not doing what we are

I5u2cohC

1   doing and going through every document that we need to.  And we

2   are not going through every document.  We are only going

3   through the documents that actually the logic of the search

4   terms tells us to look at.  We are actually not looking at the

5   ones that don't trigger that actually may contain privileged

6   information, too.

7          We have already made compromises to meet the court's

8   deadline is I guess the point I am trying to make.  We are only

9   reviewing documents that get a hit on the search terms for

10  privilege.  And so I think the special master really

11  understands what we are doing, and I would just say that the

12  June 15 date, I just don't know what I'm going to do to get

13  that done.  I need more time than that and, I think, I just ask

14  you to consider that in your ruling.

15         MR. FUTERFAS:  Your Honor, may I be heard on that?

16         THE COURT:  Yes.

17         MR. FUTERFAS:  We are very appreciative -- and I think

18  Ms. Hendon would concur with this.  We are aware of the work

19  they are doing, and we are appreciative of the care they are

20  giving.  They are doing the first run of all of this material,

21  and we are relying on their firm, as is president's counsel

22  relying on them to carefully go through it and cull out and do

23  the search terms and cull it out.  So what we get is a very,

24  very small subset.  But I am trusting, as I believe Ms. Hendon

25  is, that lawyers are carefully going through that and are doing

I5u2cohC

1    the right job and getting it to us.  So we very much value this

2    process.  And I would say this, that, you know, I think we can

3    all try and their firm can try for a date in mid June.  We

4    could come back, and maybe their firm only needs another week

5    or another ten days to get it done, or whatever it might be.

6          But I can assure your Honor that, based on the

7    conversation we have had with the special master, everyone has

8    been working very well together.  They are working very

9    diligently.  The process is working.  We are getting the

10   documents that we should be getting.  So is the president's

11   counsel.  And we are well on the way to getting this done.  So

12   whether it is done on June 15 or it is done on June 20 or

13   whatever it might be, this is a process that's working, and

14   people are working very hard and we are trusted and invested in

15   that process.

16         MS. HENDON:  Your Honor --

17         MR. HARRISON:  Judge --

18         THE COURT:  I understand.

19         MS. HENDON:  I'm sorry, Mr. Harrison.

20         If I could just make two points.

21         The first is that, without discussing here what I

22   understand the special master and her small team to be doing, I

23   do believe it is the case that it is something quite different

24   than the McDermott team, and that if you switched tasks between

25   the Bracewell firm and the McDermott team, the McDermott team

I5u2cohC

1   would be able to get everything done by June 15 and the

2   Bracewell team would be saying, We need more time.  It might

3   make sense -- it's entirely up to your Honor, if your Honor is

4   inclined -- to discuss this point, if your Honor does believe

5   that too much time is being taken -- which is not our

6   observation at all -- with the special master, because I don't

7   feel it is my place to put on the record exactly what I

8   understand that team to be doing and why it is that that team

9   can move at a certain speed.  That said, I know your Honor is

10  keen to keep us all on a fast track, and I don't mean to

11  quarrel with that in any way.

12         The second point I wanted to make was simply, on

13  behalf of the president, we endorse fully every argument that

14  Mr. Ryan and his team have made in writing concerning the *pro*

15  *hac* application of Mr. Avenatti.  We are glad that your Honor

16  will hold it in abeyance, because it sounds as if your Honor

17  has already done so, but the materials attached to Mr. Ryan's

18  letter of yesterday warrant very careful scrutiny, in my view.

19         And I will just say that when I came into the

20  courthouse this morning, there was a podium in front of the

21  courthouse with eight microphones set up on that podium, and I

22  walked by and nobody looked at me.  Nobody wanted to take my

23  picture.  And I don't know, but I don't think that podium is

24  there for Michael Cohen or Steve Ryan or for me.

25         Thank you, your Honor.

I5u2cohC

1           THE COURT:  Thank you.

2           MR. HARRISON:  Judge, just to put the point on --

3           THE COURT:  You were next, Mr. Harrison.

4           MR. HARRISON:  Just to put the point on one quick

5    thing Mr. Ryan said, just so it is clear, I'm picking random

6    numbers, if we get a batch of 10,000 documents and we review

7    the 10,000 documents, we may only designate -- I am just making

8    up numbers here -- 500 of them privileged.  So we send those

9    privilege designations to the special master is how it is

10   working, and I think the special master is only reviewing those

11   documents we have designated as privileged.  So I think our

12   subset of review is much larger than the special master.

13          THE COURT:  I understand.  Thank you.

14          Mr. Avenatti.

15          MR. AVENATTI:  Your Honor, briefly, I want to just

16   respond.

17          THE COURT:  Yes.

18          MR. AVENATTI:  Thank you.

19          Your Honor, Mr. Trump had adequate notice of my *pro*

20   *hac vice* application.  They could have filed whatever they

21   wanted to file, his counsel could have, in opposition to that.

22          So let me address what was just stated to your Honor.

23          Counsel referenced the court to the attachments that

24   were filed yesterday.  Those generally relate to a bankruptcy

25   proceeding concerning a firm that is not at issue in this case,

I5u2cohC

1    that has never represented Ms. Daniels, never will represent

2    Ms. Daniels, and is not a firm that I presently work on behalf

3    of in connection with this matter, to be clear.

4          THE COURT:  How much of this is a distinction without

5    a difference?  You are the named partner in each firm.  You

6    operate out of the same office.  What's the distinction?

7          MR. AVENATTI:  Well, your Honor, I think it's a

8    critical distinction, because that firm has never represented

9    my client.

10         But I would like to address what counsel stated.

11   Counsel is directing the court to a bankruptcy judgment as

12   reason why my *pro hac vice* should not be permitted, counsel who

13   represents Mr. Trump, who has had his own fair share of

14   bankruptcies over the years, and those haven't disqualified him

15   in various contexts, so the irony of that, your Honor, is

16   rather palpable.  Furthermore, counsel is referring to tweet

17   messages, I guess, that I sent.  Well, we know that her client,

18   her very own client, Mr. Trump, has tweeted about this matter

19   in great detail and has tweeted about Mr. Cohen in great detail

20   during these proceedings, so the irony, your Honor, of that is

21   palpable.

22         Now, let me also address the microphones that are set

23   up in front of the courthouse.  If anyone in this courtroom

24   believes that if my *pro hac* is denied those microphones are

25   going to go away or the press that is seated here is no longer

I5u2cohC

1    going to attend, they are fooling themselves.  Whether I'm in

2    this case or not, this case is going to have a considerable

3    amount of press attention, a considerable amount of public

4    interest, and for good reason, because of the issues in the

5    case and their seriousness as it relates to the President of

6    the United States, your Honor.

7          Thank you.

8          THE COURT:  All right.

9          Ms. Hendon.

10         MS. HENDON:  Thank you, your Honor.

11         I just would like to respond to the statement that I

12    believe Mr. Avenatti said "that firm" -- referring to Eagan

13    Avenatti or Avenatti Eagan -- "has never represented my

14    client."  I don't know how many times he said that.  I notice

15    that he put that in an affidavit that he filed with the court

16    last night.  That affidavit only has three paragraphs, and it

17    was information in that affidavit that Mr. Avenatti chose to

18    volunteer.  No one asked him to put that affidavit in.  And

19    paragraph 3(a) states that "The firm of Eagan Avenatti LLP is

20    not the law firm of Ms. Daniels."

21         With the court's permission, I would like to hand up

22    what I have marked as Exhibit 1.  We will give copies to

23    Mr. Avenatti and Mr. Futerfas, plaintiff, and the government.

24         MR. AVENATTI:  Your Honor, I have no idea what this

25    is.

I5u2cohC

1              THE COURT:  You don't need to speak yet.  I don't

2      either.

3              MS. HENDON:  As your Honor may be aware, Mr. Avenatti,

4      on behalf of Ms. Daniels, has two actions pending in federal

5      court -- one in California, which is stayed, and one in this

6      district before Judge Furman.  As recently as last week,

7      lawyers from the Avenatti Eagan firm were in communication with

8      the president's counsel concerning the matter pending in this

9      district.  You will see that on I think the first e-mail.

10             The second e-mail likewise shows Avenatti Eagan --

11     pardon me, Eagan Avenatti, attorneys or an attorney acting for

12     Ms. Clifford in an action against the president.

13             And the third e-mail from March 2018, just two months

14     ago, is another Eagan Avenatti e-mail sent to counsel for the

15     president -- this one in the California action -- on behalf of

16     Ms. Clifford, and on that e-mail you see that Mr. Avenatti

17     himself bears an Eagan Avenatti e-mail address.

18             Now, I had these materials when I first took the

19     podium this morning to say I had two comments -- one, I endorse

20     Mr. Ryan and, two, you know, I think the McDermott firm has

21     been working as hard as anyone can to get us the document --

22     but I chose not to bring this up.  But I think the court should

23     note that Mr. Avenatti did not need to respond to that point.

24     He did not need to put in this affidavit last night.  He chose

25     voluntarily to do it, and he was not straightforward with the

I5u2cohC

1    court.  He was not open with the court.

2         If you read paragraph 3(a) carefully, "The firm of

3    Eagan Avenatti LLP is not the law firm for Ms. Daniels."  I

4    don't know what that means, but it appears carefully

5    constructed to create an impression with the court in a matter,

6    frankly, of zero moment in these proceedings.

7         When I was a prosecutor and we would sum up in front

8    of the jury, we would say to the jury:  You know, when I

9    elicited that untruthful or misleading statement about that

10   little, tiny point from the defendant on cross, you were

11   probably bored and you were probably wondering, ladies and

12   gentlemen, why did I spend all that time on that little, tiny

13   thing about which the defendant was not candid with you?  And

14   the reason I spent time on that -- and, your Honor, the reason

15   I stood up again today -- is because when someone, especially a

16   lawyer, is prepared to be not straight forward and cute and, I

17   would say, misleading with the court on the tiniest of matters,

18   it raises a serious question about how that person, how that

19   lawyer will conduct himself on the more serious matters.

20         That's all, your Honor.  Thank you.

21         THE COURT:  Thank you.

22         MS. HENDON:  I would ask that the court receive what I

23   have marked as Exhibit 1, those three e-mails, as part of

24   today's record.

25         THE COURT:  All right.  It is currently marked

I5u2cohC

1   Intervenor Exhibit 3.  We will give it that designation.

2           MS. HENDON:  That's fine, your Honor.

3           THE COURT:  It is received.

4           Is there anything further?

5           MS. MAIMIN:  Yes, your Honor.  We would just hope the

6   court could set a date in mid June for the production of

7   documents.

8           THE COURT:  Good point.

9           Mr. Cohen's review of the materials currently in their

10  possession, in the possession of counsel for Mr. Cohen, must be

11  completed by June 15, 2018.  If it is not, the balance of the

12  materials will go to the taint team which will review them.  It

13  is important for the court to balance the slow, deliberate

14  needs of those who are asserting attorney-client privilege with

15  the need for an investigation to go forward.

16          I would like to note to Mr. Avenatti that, until you

17  are admitted here, I don't expect you to stand and be heard

18  here.  I have no control over what you do outside.  I just

19  wanted to be sure that was understood.

20          MR. AVENATTI:  Understood, your Honor.  Thank you.

21          THE COURT:  All right.  Thank you very much.

22          We will have the next conference as soon as the

23  special master decides it is a good time.

24                              oOo

25

# EXHIBIT D



🐦 **Home**   ⚡ **Moments**
Search Twitter 🔍   Have an account? **Log in** ▾

| Tweets | Following | Followers | Likes |
|---|---|---|---|
| **946** | **659** | **538K** | **875** |

**Follow**

## Michael Avenatti ✔
@MichaelAvenatti

Attorney at Law

📍 Los Angeles, CA
🔗 avenatti.com
📅 Joined February 2011

📷 **56 Photos and videos**

  
  

**Tweets**   **Tweets & replies**   **Media**

 **Michael Avenatti** ✔ @MichaelAvenatti · 3h   ⌄

Last night was not a "debut." We were invited on the show to discuss the issues, which I enjoyed. To be clear: I have ZERO interest in my own TV show. My focus is on winning the cases at hand for my client and disclosing the truth about the cover-up to the American people. #Basta

💬 487   🔁 2.1K   ♡ 12K

🔁 Michael Avenatti Retweeted

 **The Late Show** ✔ @colbertlateshow · 13h   ⌄

"I think that Michael Cohen is in a very very bad spot. And I think the President is in a very bad spot, because this is what happens when you trust your innermost secrets to a moron." @MichaelAvenatti #LSSC



💬 173   🔁 1.1K   ♡ 5.3K

 **Michael Avenatti** ✔ @MichaelAvenatti · 5h   ⌄

Thank you @Lawrence for another great interview on @TheLastWord. You are always highly prepared and it shows! msnbc.com/the-last-word/... via @msnbc

# EXHIBIT E



BLAKELY
Law Group

1334 PARKVIEW AVENUE, SUITE 280 MANHATTAN BEACH, CALIFORNIA 90266
WWW.BLAKELYLAWGROUP.COM T 310-546-7400 F 310-546-7401

E-mail bblakely@blakelylawgroup.com

June 20, 2018

**VIA EMAIL & U.S. MAIL**
Mr. Michael J. Avenatti
Avenatti & Associates, APC
520 Newport Center Drive, Suite 1400
Newport Beach, CA 92660
Email: mavenatti@eoalaw.com

Re:   **Clifford v. Davidson.**
      **Case No. 18-cv-05052-SJO-FFMx**

Dear Mr. Avenatti:

I am writing to request an in-person meet and confer conference pursuant to Local Rule 7-3 regarding the Complaint you recently filed.  Furthermore, I again raise my objection to the telephonic meet and confer last week regarding Plaintiff's proposed motion for remand.  As the Court instructed yesterday when it denied Plaintiff's Motion for Reconsideration in *Clifford v. Trump*:

> Absent a compelling showing of good cause, the Court will not
> permit the parties to displace other litigants or violate the Court's rules. While the Court is cognizant of the amount of media attention in this case, this alone is insufficient to create the exigency required for extraordinary relief. If anything, the heightened scrutiny on this action requires that the Court ensure that the rules are scrupulously followed and that justice is administered properly and with due regard to the rights of all parties involved.

As you well know from my prior objections, Local Rule 7-3 and Judge Otero Standing Order require an in-person meet and confer unless there is some emergency that prevents such a meeting.  Last week when I called to discuss this case, only your associate, Mr. Ibrahim, was on the phone from your side.  While Mr. Ibrahim appears to have been in your Newport office, you were in New York City engaging in numerous television appearances.  Far from there being any emergency preventing an in-person meet and confer, you chose to meet with the press instead of complying with the Local Rules.  I once again request that you and I have an in-person meeting so that we can

June 20, 2018
Page 2

thoroughly discuss Plaintiff's proposed motion for remand as well as the following Motions Mr. Cohen is contemplating:

**1)      Motion to Dismiss for Lack of Personal Jurisdiction**

In order to proceed with Clifford's case against Mr. Cohen in California, you must first establish in personam jurisdiction over Mr. Cohen.  *Pennoyer v. Neff*, 95 U.S. 714, 720-722 (1877).  Mr. Cohen, a resident of New York, has not consented to jurisdiction in California.  Furthermore, he does not have the requisite minimum contacts with the State of California.  *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945).  In a previous email you refused to answer me when I inquired as to why you believed California had personal jurisdiction over Mr. Cohen.  I once again request that you set forth, in detail, the basis for the purported jurisdiction over Mr. Cohen in this matter.

**2)      Motion to Consolidate**

Judge Otero has already indicated that this case is related to *Clifford v. Trump*, in that they "arise from the same or closely related transactions, happening or events" and call for determination of the same or substantially related or similar questions of law and fact." (Dkt. #11)   When separate actions before the court involve common questions of law and fact, the court may consolidate those actions.  FRCP 42(a).  As the Court has already observed, there are sufficient grounds to consolidate this case with *Clifford v. Trump*.

**3)      Motion to Stay**

The basis for the stay is already set forth in the Court's Stay Order in *Clifford v. Trump* (Dkt. #53), which you attempted to circumvent when you filed this present action.

**4)      Anti-Slapp motion**

Defendant Michael Cohen is considering filing an anti-SLAPP motion pursuant to California Code of Civil Procedure §425.16 in connection to Clifford's claim against Cohen.  Under the statute, "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

June 20, 2018
Page 3


      Here, Cohen's alleged communications with Mr. Davidson arose in connection with pre-litigation communications.  *See e.g.*, *Digarati Holdins LLC v. Young Money Entertainment LLC* (2011) 194 Cal. App. 4th 873, 887; *Seltzer v. Barnes* (2010) 182 Cal. App. 4th 953, 963

      Naturally, all of my client's claims are expressly reserved and none are waived.


      Sincerely,


      BRENT H. BLAKELY